IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NICOLE MORANO,                          :
    Plaintiff,                           :
                                         :
v.                                      :          CIVIL ACTION NO. 25-CV-3180
                                         :
CORPORAL LARRY SIPPLE, *et al.*,        :
    Defendants.                          :

**<u>MEMORANDUM</u>**

**HENRY, J.**                                                    **MAY 6 , 2026**

    *Pro se* Plaintiff Nicole Morano brings this civil action, naming as Defendants Jospeh

McCool, Carla Marino, the Sadsbury Township Police Department ("STPD"), Chief Michael

Hawley, and Corporal Larry Sipple.  The Court previously granted Morano leave to proceed *in*

*forma pauperis*.  Currently before the Court are Motions to Dismiss Morano's Complaint filed

by the Defendants, to which Morano has responded.  For the following reasons, the Court will

grant in part and deny in part the Motions to Dismiss.

## I.    FACTUAL ALLEGATIONS[1]

    Plaintiff Morano and Defendant McCool are the parents of a minor child, and the three

---

[1] The facts set forth in this Memorandum are taken from Morano's Complaint (ECF No. 2).  The
Court has also considered the exhibits that Morano attached to her Complaint and documents
upon which the Complaint relies.  *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014)
(explaining that, in evaluating a motion under Fed. R. Civ. P. 12(b)(6), a court should consider
"the allegations contained in the complaint, exhibits attached to the complaint and matters of
public record," as well as any "document integral to or explicitly relied upon in the complaint"
(citations omitted)).  Any item cited as "Video Exh." may be accessed pursuant to the Court's
Order of December 8, 2025.  (*See* ECF No. 41.)  Additionally, the Court includes facts reflected
in publicly available state court records, of which this Court may take judicial notice.  *See Buck*
*v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).  The Court adopts the pagination
assigned to all filings by the CM/ECF docketing system.  Grammar, spelling, and punctuation
errors in quoted materials are cleaned up where necessary.

lived together in Chester County, Pennsylvania, from June 2021 to February 2022 and then again from October 2022 until December 2023.  (Compl. at 7.)  This action concerns a series of events beginning with domestic disputes in 2022 and culminating with Morano's arrest and subsequent acquittal on child endangerment charges in 2024, as well as the associated child custody proceedings between Morano and McCool.

### A.    Events of January and February 2022

Morano underwent treatment for breast cancer during both periods of cohabitation with McCool, including a mastectomy in January 2022.  (*Id.*)  A few weeks prior to her mastectomy, Morano fell down the stairs in their home while she was holding the child, who was six months old.  (*See id.* at 7-8; *see also* ECF No. 2-1 at 4-9.)  Morano and McCool took the child to the emergency room, where he was treated for bruising, observed, and then discharged.  (*See* Compl. at 7-8; ECF No. 2-1 at 9.)  It does not appear that the police were contacted at the time.

On February 4, 2022, two weeks after Morano's mastectomy, she and McCool were involved in a domestic dispute.  (*See* Compl. at 8.)  Morano alleges that McCool pushed her on her surgical site three times during the dispute.  (*Id.*; *see also* ECF No. 2-1 at 31-32.)  A friend of Morano's called STPD the next day "to report the incident and the ongoing fight," and McCool "took off with [the] child."  (Compl. at 8.)  Defendant Chief Hawley and STPD Officer Scott Viola responded to the report and spoke to Morano at home on February 5.  (*Id.*; *see also* ECF No. 2-1 at 10-27; Video Exh. A1.)  Morano states that when she spoke to STPD, she "did not initially disclose physical abuse," that is, McCool's having pushed her during the argument, "due to fear of retaliation, but she expressed being fearful."  (Compl. at 8; *see also* ECF No. 2-1 at 23.)  Morano told Hawley and Viola that she feared for the child's safety because McCool was "sleep deprived."  (ECF No. 2-1 at 16.)  Hawley asked if Morano had "established residency" in

2

the home and then advised her that she did not have to leave the home "unless [McCool] gets an eviction order." (*Id.* at 22.)  Hawley took possession of a handgun that McCool kept in the home, explaining to Morano how McCool could retrieve it.  (*See id.* at 23-25; *see also* Video Exh. A1.)  Hawley informed Morano that "if [she] felt that [she was] in physical danger, . . . there are remedies available with regard to protection from abuse orders and things of that nature," offered to supply her with further information, and provided his direct phone extension. (ECF No. 2-1 at 24-27.)  Hawley and Viola took contact information for McCool and his parents, where Morano thought he might have gone with the child.  (*See* ECF No. 2-1 at 21, 26-27.)

Viola's resulting police report indicates that he reached out to another police department to make contact with McCool at his parents' home and check that McCool and the child were safe.  (*See* ECF No. 2-1 at 14.)  Viola then spoke with McCool on the phone, and McCool told Viola that Morano had struck him in the face on prior occasions and had tried to knee him in the groin during the argument the night before.  (*See id.*)  McCool also referred to the January fall down the stairs and said that had occurred during another argument between himself and Morano.  (*Id.*)  Viola "informed McCool of domestic violence information and the eviction process," and told him how to recover his handgun.  (*Id.*)  After speaking to McCool, Viola confirmed with the other police department that they had found McCool and the child safely at McCool's parents' house.  (*Id.*)  McCool later arrived at STPD, retrieved his handgun, and "was informed and given Domestic Violence information and Victims Rights Information."  (*Id.*)

Morano moved out of the house the next day, February 6, 2022, then went to STPD, where she was interviewed and made a written statement about the incident that occurred two nights before.  (*See* Compl. at 8; ECF No. 2-1 at 28-38.)  In both the written statement and interview, she described how McCool had pushed her on her surgical site during the argument.

(*See* ECF No. 2-1 at 31-32, 34, 36.)  The STPD report indicates that Morano was informed "that she could go to the Justice Center and get a PFA [Protection from Abuse order] and custody of her child if needed." (*Id.* at 29.)  On February 7, 2022, Morano went to the Chester County Court of Common Pleas, where she sought and received a ten-day temporary PFA to protect her and the child from McCool.  (*See* Compl. at 8; ECF No. 2-1 at 39-50.)

Morano states that she emailed Defendant Corporal Sipple a copy of the PFA on February 8, "and notified him of her injuries," then Sipple served the PFA on McCool later that day.  (Compl. at 14.)  Morano alleges that Sipple failed to document his interaction with McCool other than his "denial of abuse," that Sipple "conducted no follow-up with [her] and made no inquiry into her medical care," and that Sipple told her no charges would be filed.  (*Id.*)  She asserts that she was not provided with records of any STPD investigation into McCool's "version of events," but that certain bodycam footage was provided to Defendant McCool and his attorney, Defendant Marino, during custody proceedings.  (*Id.* at 14-15.)  She was inadvertently copied on an email from Hawley to Sipple, "stating, 'I find her present assertions to lack the necessary connections with which to be able to establish probable cause,' and prais[ing McCool] as 'candid in every respect.'" (*Id.* at 14.)  She states that "[o]n February 10, [Hawley] instructed [her] not to contact the department further.  No investigation was opened, and no additional witnesses . . . were interviewed." (*Id.* at 15.)

It appears from Morano's Exhibits that a hearing on the PFA was held on February 17, 2022, at which the court instituted a thirty-day "cooling-off" period, established a visitation schedule for McCool and the child, and stated that if there were no further incidents of abuse within the cooling-off period, the PFA would be dismissed at the next hearing on March 21, 2022.  (*See* ECF No. 2-1 at 52.)  Morano states that, although she was "advised to seek" a more

4

permanent PFA, "she allowed it to be dismissed after [the] cooling-off period out of a desire to preserve the nuclear family structure."  (Compl. at 8; *see also* ECF No. 2-1 at 54.)  Morano states that McCool "was never charged" in connection with these events, and she moved back in with McCool in October 2022.  (Compl. at 8.)

### B.    March 2023 Broken Glass Incident

Morano asserts that on March 5, 2023, "during a domestic dispute, [McCool] shattered a [glass] diffuser on the floor,[2] recorded [Morano's] reaction with her cellphone, and then withheld her phone from her.  [McCool] later accused [Morano] of endangering their child."  (Compl. at 9.)  There was no immediate report or investigation of this incident, but on May 8, 2023, the Chester County Department of Children, Youth and Families ("CYF") received a call through its ChildLine service about the March 5th incident.  (*See id.*; *see also* ECF No. 2-1 at 56-63.)  An unidentified third party[3] reported to ChildLine that "there was a time there was broken glass and [Morano] put the [child] in the glass and told the [child] to run across the glass."  (ECF No. 2-1 at 60.)  The caller did not know if the child was wearing shoes or clothing or whether there were any injuries.  (*Id.*)  The caller also mentioned the January 2022 fall down the stairs.  (*Id.*)  The ChildLine report indicated that CYF Caseworker Lakisha Selby was assigned to the case and would follow up for further assessment within three to five days "to assure the safety and well-being" of the child.  (*Id.* at 59-60.)  Morano asserts that "Selby found no evidence of abuse and closed the case."  (Compl. at 9.)  Selby's letter to Morano and McCool dated May 18, 2023,

---

[2]  The object is described elsewhere in the record as an incense burner; however characterized, the Court understands the allegation to be that it was a glass object.

[3] Morano asserts that the unidentified caller was the wife of McCool's employer.  (*See* Compl. at 9.)  McCool later testified during a hearing that he believed a babysitter was the caller.  (*See* ECF No. 2-2 at 153.)

stated that CYF had concluded its intake assessment and determined that the child was healthy and safe, therefore ongoing CYF services were unnecessary. (*See* ECF No. 2-1 at 57.)

### C.    October 2023 Reports to Corporal Sipple

On October 16, 2023, Morano and McCool had an argument, during which Morano fell and hit her head. (Compl. at 9.) Morano told McCool that she "was going to call the police and move out," but she did not make a police report about the incident, because she "did not feel comfortable with STPD." (*Id.*) On October 17, McCool placed a call to ChildLine himself and reported the January 2022 fall down the stairs and the March 2023 broken glass incident. (*Id.* (citing ECF No. 2-1 at 66-71).) Morano asserts that "[t]he report was closed within a week after [CYF] realized it was repeat allegations," and that she "was never notified." (*Id.*)

On October 18, McCool went to STPD in person and met with Defendant Corporal Sipple. (*Id.*) Morano alleges that Sipple "advised [McCool] on PFA strategy and criminal charges to acquire [McCool's] 'long-term goals.'" (*Id.*) Morano includes the bodycam footage and corresponding transcript of Sipple's interview with McCool, as well as Sipple's resulting report, as Exhibits. (*See generally* ECF No. 2-1 at 64-105; Video Exh. A3.) McCool described a general pattern of arguments between him and Morano, and explained that, in addition to the child he had with Morano, he shared custody of an older child with another mother. (ECF No. 2-1 at 91.) Sipple mentioned having encountered McCool in February 2022 and asked if McCool had made any reports to police since then, which he said he had not. (*Id.* at 90.) McCool reported that the domestic disputes with Morano had recently escalated, and during the October 16th incident, Morano was "screaming and yelling," that she kicked him, he grabbed her foot, and she fell. (*Id.*) McCool stated that there "was a dresser behind her" when she fell and he knew "if something would've happened or she would've hit her head, [he would be] in jail for

the rest of [his] life[, so he] can't have any more of this." (*Id.*)  McCool also discussed an unspecified time when Morano purportedly confronted him while holding a knife.  (*Id.* at 96-97.)

Sipple asked what McCool was "looking to see happen," and also asked McCool if he was aware of Morano's "end game, what does she want?" (*Id.* at 92, 95.)  McCool stated that he no longer wanted to live with Morano, and Sipple explained that McCool would have to go through a formal eviction process.  (*Id.* at 95, 98.)  McCool stated that he "can't afford to be paying her child support, fighting her in court, fighting for an eviction, and just unnecessary arguing, fighting all the time just [about] decisions for a child." (*Id.* at 98.)  Sipple explained that McCool's allegations about Morano's behavior toward him rose only to the level of "harassment at best, which is strike, push, kick, shove," and that such a charge would not "be anything more than a summary level [of offense]." (*Id.* at 97.)  Sipple also explained that if McCool were injured in an altercation, "then it would rise to a misdemeanor level of assault." (*Id.*)

Sipple mentioned PFA options and explained the various types of PFAs available, specifically that an "emergency" PFA "is basically just good until the end of the next business day," and that, in Sipple's opinion, they "are useless unless you get it on a Friday and you're covering yourself through the weekend." (*Id.* at 94.)  Sipple explained to McCool that he should "think about the possibility of having to work through an eviction," "having to deal with child custody," and "in addition to protecting yourself, protecting your son, you've got to think about your long-term protection, not just your short-term protection." (*Id.* at 98.)  After hearing McCool describe his altercations with Morano, Sipple stated, "for tonight's purposes, [his] recommendation would be to seek out a PFA," and that McCool should dial 911 "anytime that there [are] threats, especially physical []violence[,] even to herself." (*Id.* at 101.)

During the interview, McCool mentioned the broken glass incident and asserted that Morano had "admitted" to it when talking to CYF, but that he had been told when making his latest report that the lack of injuries to the child were the likely reason that CYF had not pursued the issue. (ECF No. 2-1 at 87, 95-96.) Sipple explained that he had received the ChildLine report McCool made the previous day, and that they would have a separate interview about that once they had discussed the domestic issues between McCool and Morano. (*Id.* at 96.) Morano's Exhibits include a handwritten statement of McCool's allegations, including a description of the January 2022 fall down the stairs and trip to the emergency room, the March 2023 broken glass incident, and the altercation on October 16, 2023. (*Id.* at 78-81.) The second interview concerning McCool's ChildLine report was not recorded on Sipple's bodycam but is summarized in another report. (*See generally* ECF No. 2-1 at 64-87.)

Sipple subsequently contacted Caseworker Selby on October 31 and, according to Sipple, "[w]hen she referred to her notes, she wrote that Morano admitted to 'putting [the child] down by the broken glass.'" (*Id.* at 87.) Selby referred Sipple to her CYF colleague and contributor to the case file, who told Sipple that "due to the fact that [the child] was not injured as a result of the broken glass incident combined with the amount [of time] that has passed since the previously unreported incident, their office closed their report." (*Id.*) Sipple noted McCool's request that, "[u]nless charges are going to be filed, [McCool] would rather [STPD] not contact Morano about this, as he believes it would only serve to exacerbate their already tenuous domestic relationship." (*Id.*) After these conversations, Sipple reached out to the District Attorney's office to report that he believed he had probable cause to arrest Morano for endangering the welfare of a child, based on the March 2023 broken glass incident. (*Id.*) Sipple

received approval to proceed with the charges on November 1, 2023, but did not immediately apply for a warrant to arrest Morano.  (*See* ECF No. 2-2 at 28-32.)

### D.    December 2023 Custody Disputes

Morano states that police responded to their home twice in November 2023 because of domestic disturbances between her and McCool; first on November 13, when STPD officers responded to a 911 call about an argument over "food in the fridge," and then on November 24, when "Pennsylvania State Police responded to a domestic incident and documented that while both parties admitted to physical contact, [McCool] acted first."  (Compl. at 18.)  No charges appear to have resulted from either incident.  (*See id.*)

On December 8, 2023, Morano moved out of the house she shared with McCool and into her own home in Berks County.  (*See* ECF No. 2-1 at 107.)  After disagreements over an informal custody arrangement for the child, Morano filed an emergency petition for custody in the Berks County Court of Common Pleas on December 21, 2023.  (*See id.* at 107-09; *see also* Compl. at 10, 19.)  Because the child was with McCool when Morano received the resulting custody order, she "requested STPD assistance with a custody exchange."  (Compl. at 10.) Defendant Sipple and another STPD Officer met Morano at McCool's home, served the new custody order on McCool, and assisted with an exchange of custody.  (*See id.* at 10, 19-21; *see also* ECF No. 2-1 at 122-131; Video Exhs. A6, A7, A8).  After placing the child in Morano's custody, Sipple went back into the house and "told [McCool] that he 'had enough to charge [Morano]' and that he would be arresting her in the future."  (Compl. at 21.)

McCool immediately filed his own emergency petition for custody in the Chester County Court of Common Pleas, and on December 22, that court issued an order for Morano to show cause why McCool's petition should not be granted, and set a hearing for December 28.  (*See*

Compl. at 10; *see also* ECF No. 2-2 at 11-25.)  However, it appears that the hearing in Chester County did not occur on that date, and instead the parties attended a hearing in the Berks County Court of Common Pleas on December 28, based on Morano's custody petition in that court.  (*See* Compl. at 10; ECF No. 2-1 at 111-120 (hearing transcript).)  The Berks County court entered an order on the record for temporary shared custody, (*see* ECF No. 2-1 at 117-19), with a conciliation hearing scheduled for January 5, 2024, (*see* Compl. at 10).

### E.    January 2024 Arrest

Morano cites emails between McCool, Marino, and Sipple on December 27, 2023, and January 4, 2024, in which McCool asked "about the status of [Sipple] charging [Morano]." (Compl. at 22.)  On Friday, January 5, 2024, Sipple obtained a warrant for Morano's arrest signed by a Chester County Magisterial District Judge.  (*See* Compl. at 11; ECF No. 2-2 at 27.) Morano alleges that at 12:37 a.m. on January 5, "Sipple emailed McCool stating that he had 'put together the charges tonight,'" and that McCool in turn emailed Sipple about "how 'to get [the child] out of harm's way when this happens.'"  (ECF No. 39 at 9; *see also* Compl. at 22.)  At 1:00 p.m. on January 5, "[McCool]'s Berks County custody attorney informed [Morano]'s custody counsel at [the] conciliation [hearing] that [Morano] would be arrested that afternoon— before any public record of the warrant existed."  (Compl. at 22.)  Morano then "contacted STPD and was told by Sherriff Imhoff that he had just delivered paperwork—left by [Sipple]—to the courthouse," and that Morano "was being charged with a felony: Endangering the Welfare of a Child."  (*Id.*)  Morano's attorney spoke to Sipple and was told "that she could self-surrender the following business day," that is, Monday, January 8, 2024, in light of the fact that "the warrant posted at 4:24 p.m. on Friday."  (*Id.* at 23 (citing ECF No. 2-2 at 47).)

"At 8:23 p.m. that night [January 5], [McCool] obtained an emergency PFA against

[Morano]," signed by a different Chester County Magisterial District Judge, "citing the active felony warrant as the basis for his fear." (*Id.* (citing ECF No. 2-2 at 34-39).)  The PFA listed McCool and the child as the protected parties, with an expiration date of Monday, January 8, 2024, and was based on McCool's expressed fear that the child could be harmed "when [Morano] finds out about the warrant." (ECF No. 2-2 at 34-35.)

On the night of January 5, 2024, the child was in Morano's custody at her home in Berks County. (*See* Compl. at 23.)  Sipple called Officer Christopher Dunlap of the Caernarvon Township Police department and "advised that he was sending []McCool to [Dunlap's] office with an emergency PFA" that ordered Morano not to have contact with McCool or the child, but does not appear to have mentioned the newly acquired arrest warrant. (ECF No. 2-2 at 42.)  Morano alleges that Sipple "falsely informed" Dunlap that Morano "was suicidal, prompting a near forced entry." (Compl. at 11 (citing ECF No. 2-2 at 50-51; Video Exh. A10).)  McCool was parked nearby and Dunlap, apparently believing that Morano had already been "arrested today," spoke with McCool in his car before making contact with Morano at the door to her home just before 10 p.m. (ECF No. 2-2 at 50-52; Video Exhs. A9-A10.)  Morano's criminal lawyer was on the phone, and Dunlap spoke with both of them to explain that police were there to serve the PFA and that the child had to go with McCool. (ECF No. 2-2 at 52-56; Video Exhs. A9-A10.)  Dunlap also spoke on the phone with Morano's custody lawyer and discussed the Berks County temporary custody order issued on December 28 and whether it was superseded by the January 5 PFA issued in Chester County. (ECF No. 2-2 at 58-61; Video Exhs. A9-A10.)  Dunlap spoke with the Assistant District Attorney on duty, then relayed to Morano and her counsel that the PFA superseded the custody order. (ECF No. 2-2 at 61-66; Video Exhs. A9-A10.)  Morano's criminal attorney then told the officers to leave the home, which they did. (ECF No. 2-2 at 67-

11

68; Video Exhs. A9-A10.)

Dunlap spoke to McCool again, with Defendant Marino on McCool's phone, to ask whether a compromise could be reached to send the child with Morano's father. (ECF No. 2-2 at 74-76; Video Exh. A10.) McCool refused, and Marino told Dunlap that there was an active warrant for Morano's arrest. (ECF No. 2-2 at 78-79; Video Exh. A10; Compl. at 23.) Dunlap ran Morano's name through his computer and discovered the active warrant. (ECF No. 2-2 at 82; Video Exhs. A9-A10.) Morano came outside and the officers on the scene detained her while Dunlap contacted Sipple to ask if he should arrest Morano on the warrant. (ECF No. 2-2 at 82-91.) Sipple's report indicates that he spoke to Dunlap just after 11:00 p.m. and "explained that the warrant was brand new and that [Sipple] had made arrangements with Morano's attorney for her to turn herself in. [Sipple] followed that with, if Morano was giving them a hard time about the PFA we sent Joseph McCool up to them with for them to serve on Morano, and turning McCool's son over to him as an additional protected person, they could just pick her up on the warrant and we would come get her." (*Id.* at 47.)

Dunlap placed Morano under arrest, pursuant to the warrant. (*Id.* at 93-94; Video Exhs. A9-A10.) Morano agreed to waive extradition back to Chester County, and Dunlap drove her to meet Sipple and transfer her to STPD custody. (ECF No. 2-2 at 95-127; Video Exh. A10.) Following the transfer of custody, Morano was booked at Chester County Prison and spent the night in jail. (Compl. at 24; ECF No. 2-2 at 48.)

F.      **Criminal Trial and Other Subsequent Events**

On Monday, January 8, 2024, McCool, represented by Marino, attended an *ex parte* hearing without Morano present in the Chester County Court of Common Pleas, regarding McCool's emergency PFA. (Compl. at 11 (citing ECF No. 2-2 at 129-156).) A temporary PFA

was put in place that allowed Morano only supervised visitation; however, it appears that separately, as a condition of her bail on the felony charge, she was not permitted any contact with the child.  (Compl. at 11-12; *see also* ECF No. 2-1 at 155-182.)  The bail condition was lifted by the criminal court in April 2024 to allow the family court that was hearing the PFA and custody matters to determine custody and visitation issues.  (Compl. at 12; *see also* ECF No. 2-1 at 178-182.)

Morano was tried at a bench trial in the Chester County Court of Common Pleas in September 2024 on the lone charge of endangering the welfare of a child.  (Compl. at 12.)  Morano includes excerpts from the trial transcript as an Exhibit to her Complaint.  (*See generally* ECF No. 2-3 at 2-112.)  McCool, Selby, Sipple, and Morano all testified.  (*See id.* at 3.)  A portion of McCool's testimony concerned his conversations with Sipple about the status of criminal charges against Morano and the timing of those conversations in relation to the custody proceedings.  (*See id.* at 46-50.)  During Selby's testimony, she explained the difference in CYF's classifications of cases and the circumstances that trigger a notification to police.  (*See id.* at 63-64.)  Selby also testified that when she investigated the May 2023 ChildLine report, "[Morano] stated there was a verbal altercation going on with her and [McCool] and [McCool] threw a glass on the ground and []Morano put the child on the side of the glass, not inside the glass, but on the side."  (*Id.* at 65; *see also id.* at 68-69.)  Sipple's testimony largely centered on: (a) the time delay between his receiving the October ChildLine report and applying for the warrant in January, and (b) what he learned from Selby to corroborate McCool's account of the broken glass incident.  (*See generally id.* at 76-108.)  The court ultimately found Morano not guilty, with the judge stating: "[McCool] doesn't get to throw and break the glass and then step back and we're going to pick out this little piece of what happened," and "I do not find all the

necessary elements beyond a reasonable doubt, most of them but not all of them." (*Id.* at 112-115.)

Morano alleges that throughout the pendency of her charges and after her acquittal, McCool and Marino "continue[d] to file retaliatory motions and make false claims to the court," "made scheduling supervised visits unnecessarily challenging in the guise of best interests of the child," and "misused privileged police evidence and attempted to defraud public resources with false statements about Plaintiff's incarceration, and [the] child receiving CYF services." (Compl. at 12 (citing ECF No. 2-3 at 118-164).)  It appears that shared legal and physical custody of the child was granted to Morano and McCool on December 13, 2024. (*See id.* at 48; *see also* ECF No. 39 at 13.)

### G.    Procedural History

Morano's Complaint in this action asserts federal constitutional claims pursuant to 42 U.S.C. § 1983 and claims arising under Pennsylvania law. (*See* Compl. at 40-57.)  She seeks compensatory and punitive damages, as well as declaratory and injunctive relief. (*Id.* at 58-59.) The Court granted Morano leave to proceed *in forma pauperis*. (ECF No. 6.)  Following service, all Defendants moved to dismiss the Complaint for failure to state a claim. (*See* ECF Nos. 25, 34, 43.)  Morano responded to the Defendants' Motions, (*see* ECF Nos. 39, 40, 45), so they are fully briefed and ripe for disposition.

## II.    STANDARD OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted).  In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

14

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555.) "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

To determine whether a complaint filed by a *pro* se litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether that complaint, liberally construed, contains facts sufficient to state a plausible claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (noting that *pro se* filings are construed liberally). Additionally, since Jones is proceeding *in forma pauperis*, the Court is statutorily authorized to independently screen her Amended Complaint and dismiss it "at any time" pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) if, among other things, it fails to state a claim. *Brown v. Sage*, 941 F.3d 655, 662 (3d Cir. 2019) (*en banc*) ("To repeat, the statute requires a court to dismiss an IFP complaint 'at any time' if it determines that the complaint is frivolous, malicious, or fails to state a claim.").

The standard under this screening provision is the same standard that governs a dismissal under Rule 12(b)(6). *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).

## III.    DISCUSSION

### A.    Claims under Federal Law

Morano asserts claims for violations of her constitutional rights. The vehicle by which federal constitutional claims may be brought in federal court is 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted); *see also Groman v. Township of Manalapan*, 47 F .3d 628, 638 (3d Cir. 1995) ("The color of state law element is a threshold issue; there is no liability under § 1983 for those not acting under color of law." (citation omitted)). Morano includes McCool and Marino in her federal claims, asserting that these private parties acted under color of state law. She names Corporal Sipple in his individual and official capacity, and names Chief Hawley in his individual and official capacity on a theory of supervisory liability. Finally, she asserts claims for municipal liability against STPD. The Court discusses each in turn.

### 1.    State Action

Whether a defendant is acting under color of state law—i.e., whether the defendant is a state actor—depends on whether there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (internal quotations omitted). "To answer that question, [the Third Circuit has] outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists: (1) whether the private entity has

16

exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (internal quotations and alteration omitted).

"Action taken by private entities with the mere approval or acquiescence of the State is not state action." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999). Rather, to support a finding of state action, "the government must be 'responsible for the specific conduct of which the plaintiff complains.'" *Borrell v. Bloomsburg Univ.*, 870 F.3d 154, 160 (3d Cir. 2017) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). "A private party 'who corruptly conspire[s]' with a state official will be considered a state actor under § 1983." *Kitko v. Young*, 575 F. App'x 21, 26 (3d Cir. 2014) (*per curiam*) (quoting *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175-76 (3d Cir. 2010)). However, "to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred." *Great W. Mining*, 615 F.3d at 178. "[A] bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556.

Morano asserts that McCool and Marino acted jointly with or conspired with the other Defendants such that their behavior can fairly be attributed to the state for the purposes of her claims under § 1983. (*See* Compl. at 34-36, 38-39.) McCool argues that his complaints to the police and participation in the related police investigations cannot render him a state actor. (*See* ECF No. 34 at 9-11 (citing, *inter alia*, *Shero v. Gallagher*, No. 24-6073, 2025 WL 209174, *2-3 (E.D. Pa. Jan. 15, 2025)).) Marino argues that she is not a state actor under any relevant test. (*See* ECF No. 43 at 9-13 (citing, *inter alia*, *Kach*, 589 F.3d at 646).) Morano responds that her

allegations are sufficient to plead that both McCool and Marino acted under color of state law. (*See* ECF No. 39 at 28, 44; ECF No. 45 at 5-8.)

Morano has not met her pleading burden.  While she alleges that McCool and Marino sought to have Morano charged with a crime by Sipple and sought PFAs and custody decisions from the courts, that is not sufficient to plead state action by these private parties.  "[A]n otherwise private actor may become a state actor where he follows—but not when he abuses—state-created procedures that either delegate the State's authority to him or allow him to invoke it in such a way that agents of the State automatically (i.e., without exercising judgment) exercise it on his behalf." *Mikhail v. Kahn*, 991 F. Supp. 2d 596, 653 (E.D. Pa. 2014), *aff'd*, 572 F. App'x 68 (3d Cir. 2014).  Morano's allegations do not support the conclusion that McCool or Marino exercised any state authority that had been delegated to them.  Instead, Morano alleges only that they sought to influence the discretionary decisions of state actors, namely, police officers and judges, and then coordinated their own actions as attorney and client once those decisions had been rendered.  Morano's allegations concerning her arrest show that Sipple and Dunlap made discretionary decisions throughout those events.  That McCool was the complainant, that he was present at the scene of Morano's arrest for the exchange of custody after the enforcement of the PFA, and that Marino alerted Dunlap to the existence of the warrant do not convert their participation in those events into state action, even assuming *arguendo* that McCool or Marino made false allegations or misled the police.  *See Yoast v. Pottstown Borough*, 437 F. Supp. 3d 403, 420 (E.D. Pa. 2020) ("Providing false information to the police—even deliberately—does not transform a private party into a state actor."), *aff'd*, No. 22-1960, 2023 WL 4418213 (3d Cir. July 10, 2023); *Collins v. Christie*, No. 06-4702, 2007 WL 2407105, at *4 (E.D. Pa. Aug. 22, 2007) ("[E]ven if Dr. Columbo intentionally provided the false information to the police, the

18

plaintiff would still fail to state a claim under § 1983."); *O'Neil v. Beck*, No. 04-2825, 2005 WL 2030319, at *2 (M.D. Pa. Aug. 4, 2005) (concluding that allegations that a private citizen filed a false police report and wanted to see the plaintiff arrested are "simply insufficient" to establish that the private citizen is a state actor for purposes of a claim brought pursuant to § 1983).

As for McCool and Marino's conduct in relation to the PFA, "[a] private litigant's use of state court proceedings to obtain an *ex parte* temporary restraining order does not satisfy the color of law requirement of § 1983," and "the simple seeking and obtaining of a temporary restraining order, or even the action of a private party who misused a lawful state procedure with inadvertent assistance from a state court judge, involved an independent evaluation by the judiciary such that it could not be said that the private litigant was acting 'under color of state law,' nor could such a litigant be charged with responsibility for an independent judicial decision." *Mikhail*, 991 F. Supp. 2d at 654 (cleaned up). This Court has specifically held that, in Pennsylvania, "a PFA petitioner does not have an automatic entitlement to relief, but must instead subject herself to a hearing before a judge, whose discretion, far from being 'enlisted,' 'invoked,' or 'directed,' makes an independent determination following a hearing that, while it can be said to be state action, can no longer be said to be the action of the private actor." *Id.* at 655 (citations omitted). Accordingly, any federal claims against McCool and Marino will be dismissed.

### 2.    Malicious Prosecution and False Arrest – Probable Cause

In Counts I and II of her Complaint, Morano asserts claims for malicious prosecution and alleges a conspiracy to do so. (*See* Compl. at 40-43.) In Count III of her Complaint, Morano

19

asserts claims of false arrest and unlawful seizure, in violation of the Fourth Amendment.[4]  (*See* Compl. at 43-44.)  "To assess claims of false arrest, the court must determine whether 'the arresting officers had probable cause to believe the person arrested had committed the offense.'" *Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017) (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)).  In turn, to properly allege a malicious prosecution claim, a plaintiff must show the following:

> (1) the defendant initiated the proceeding; (2) the criminal proceeding ended in [the] plaintiff's favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Harvard v. Cesnalis*, 973 F.3d 190, 203 (3d Cir. 2020) (citing *Est. of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)).  "As the Supreme Court has explained, claims for false arrest challenge 'detention without legal process,' while malicious prosecution involves seizure 'pursuant to legal process.'"  *Rivera-Guadalupe v. City of Harrisburg*, 124 F.4th 295, 303 (3d Cir. 2024) (first quoting *Wallace v. Kato*, 549 U.S. 384, 389 (2007); then quoting *Thompson v. Clark*, 596 U.S. 36, 42 (2022)).  "If the plaintiff is held pursuant to legal process, then [her] proper claim is a malicious prosecution claim, which is a claim involving the 'wrongful institution of legal process' (not the absence of legal process)."  *Voorhis v. Ginkel*, No. 24-2859, 2025 WL 2556241, at *2 (3d Cir. Sept. 5, 2025) (*per curiam*) (quoting *Wallace*, 549 U.S. at 390). Accordingly, the Court will dismiss Morano's false arrest claims and consider only her malicious prosecution claims.  Regardless, both "false arrest and malicious prosecution hinge on probable

---

[4]  Morano asserts these claims against McCool, Marino, Hawley, and Sipple, as she does for the majority of her federal claims.  Because McCool and Marino are not state actors for the reasons discussed above, and because her official capacity claims and claims against Hawley for supervisory liability are evaluated separately below, the Court's analysis in this section is focused on her claims against Sipple in his individual capacity.

cause," so the Court must evaluate whether probable cause existed at the time of Morano's arrest. *Andrews*, 853 F.3d at 697.

The focus of the inquiry when a malicious prosecution plaintiff was arrested pursuant to a facially valid warrant is whether the defendant officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant." *Id.* (cleaned up) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)); *see also Pinkney v. Meadville*, 95 F.4th 743, 748 (3d Cir. 2024) ("Normally, to evaluate probable cause, we would ask whether a reasonable officer would have found a fair probability that there had been [a crime] and that [the plaintiff] had committed it. But when, as here, a judge issues an arrest warrant, we defer to it unless the officer misrepresented material information to get the warrant." (citations omitted)). As the United States Court of Appeals for the Third Circuit has recently explained:

> Challenges to probable cause determinations by a neutral magistrate are different than those challenging an officer's warrantless arrest. The officer's sole job in drafting the affidavit of probable cause is to provide the neutral decisionmaker with sufficient information for an independent probable cause determination. His job is not to make his own determinations.
> Probable cause eschews bright-line rules, so we have avoided setting forth specific categories of information that must be included in affidavits of probable cause, or those that are entirely irrelevant. Still, an officer must include in the affidavit all information, within his or her knowledge, that any reasonable person would know that a judge would want to know in making a probable cause determination. Officers need not tell all: they are not required to include every potentially evocative detail that would interest a novelist or gossip, nor must they include every single piece of evidence for every single point. However, they are not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.

*Kendig v. Stolar*, --- F.4th ---, 2026 WL 1145264, at *3 (3d Cir. Apr. 28, 2026) (cleaned up) (citing, *inter alia*, *Illinois v. Gates*, 462 U.S. 213, 239 (1983) ("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others.")). If it appears that an affidavit of

probable cause suffered from misleading assertions or omissions, the Court must then determine "whether those assertions or omissions were material, or necessary, to the finding of probable cause." *Andrews*, 853 F.3d at 697 (cleaned up) (quoting *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468-69 (3d Cir. 2016)).

Sipple charged Morano with endangering the welfare of a child ("EWOC") in violation of 18 Pa. Cons. Stat. § 4304(a)(1), which provides, in relevant part: "A parent . . . supervising the welfare of a child under 18 years of age, . . .  commits an offense if [s]he knowingly endangers the welfare of the child by violating a duty of care, protection or support." *Commonwealth v. Delamarter*, 302 A.3d 1195, 1201 (Pa. Super. Ct. 2023).  Although "the defendant must be aware that they have placed the child in a perilous or dangerous situation, they do not have to be aware of the certainty of a particular result." *Id.* at 1205.  "[T]he EWOC statute is intended to cover a broad range of conduct in order to safeguard the welfare and security of children." *Id.* at 1207. Sipple's Criminal Complaint asserted that Morano "did knowingly endanger the welfare of [the] child by violating a duty of care, protection or support, namely, by intentionally placing him down barefoot on, in, among broken glass and telling him [to] 'run[].'"  (ECF No. 2-2 at 30.) Sipple's accompanying Affidavit of Probable Cause stated:

> On Wednesday 10/18/2023 at about 0927 hours, I was sent a CY47 Childline Report of Suspected Child Abuse and Neglect report #9941448.  This report indicated that when [the child] was about 18 months old, his mother Nicole placed him around broken glass. During my subsequent investigation it was found that during a dispute with [the child]'s father on March 3, 2023, Morano was holding [the child] and had a bag containing broken glass from an incense burner.  She emptied the bag on the floor and placed a barefoot [child] in/on/around the broken glass and told him to run.
> Based upon the above information, your Affiant respectfully requests a warrant be issued for the arrest of the defendant to answer to the above charges.

(Id. at 31.)  Morano alleges that Sipple's affidavit "omitted exculpatory evidence and misrepresented material facts, including: a. failing to disclose CYF's finding that the allegations

were unsubstantiated [and] b. failing to interview Plaintiff to get both sides of the narrative."
(Compl. at 41.)

As to CYF's conclusions, Morano's pleading does not include sufficient facts to support the assertion that Sipple should have been aware that CYF found the allegations about the March 2023 glass incident "unsubstantiated."  To the contrary, Sipple's knowledge was based in part on having contacted CYF and being told by Selby that Morano "admitted to 'putting [the child] down by the broken glass.'"  (*See* ECF No. 2-1 at 87.)  The letter to Morano and McCool from Selby indicated that CYF chose not to pursue further action because the child was "healthy and safe," and Sipple was told by Selby and her colleague that CYF chose not to act when the incident was reported again in October 2023 report because of the lack of injuries and the lapse of time.[5]  (*Id.* at 57, 87.)  It is thus not clear from the Complaint and Exhibits that Sipple should have been aware that CYF found the allegations concerning the glass incident "unsubstantiated."

As to Morano's assertion that Sipple's Affidavit was deficient because he failed to interview her for her own side of the story, this allegation standing alone does not undermine the finding of probable cause, because "[e]ven if [Sipple] had elected to interview [Morano] prior to making his decision, he would not have been required to accept her version of events."  *Wexler v. Hawkins*, --- F. 4th ---, 2026 WL 1090195, at *4 (3d Cir. Apr. 22, 2026) ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018))).  "[T]he [probable cause] standard does not require that officers correctly resolve conflicting evidence or that their determinations of

---

[5]  Sipple's notes are unclear as to whether the "amount [of time] that has passed since the previously unreported incident" mentioned by CYF as a basis for not pursuing further services was a reference to the glass incident or the earlier January 2022 fall down the stairs.  (*See* ECF No. 2-1 at 87.)

credibility, were, in retrospect, accurate." *Dempsey*, 834 F.3d at 467 (citation omitted); *see also Wexler*, 2026 WL 1090195, at *4.

Nonetheless, even if neither of these two specific omissions are alone sufficient to undermine the probable cause determination, the Court concludes that Morano's allegations, taken as a whole, state a plausible claim to relief at this stage.[6] A probable cause "determination is necessarily fact-intensive, and it will usually be appropriate for a jury to determine whether probable cause existed," although that determination may be made at earlier stages in certain circumstances. *Dempsey*, 834 F.3d at 468. "[T]here may be instances when no single omission or misrepresentation is sufficient to defeat a finding of probable cause, but the combined effect of the omissions and misrepresentations suffices to call into question the reliability of the affiant and the affiant's witnesses such that the question of probable cause cannot be resolved on a summary judgment motion," *Andrews*, 853 F.3d at 703 n.16, let alone when evaluating whether the Complaint states a claim to relief.

Because Sipple's Affidavit was based on McCool's version of events—given that he was the only person present for the broken glass incident other than Morano and the child—the Court must pay particular attention to whether the Affidavit provided sufficient information for the issuing magistrate to assess the reliability of McCool's account. *See Swainson v. City of Philadelphia*, No. 22-2163, 2025 WL 1854076, at *15 (E.D. Pa. July 2, 2025) ("[W]hen the witness is the sole source of information, we cast a brighter light on his account to ensure that it

---

[6] Sipple's Motion to Dismiss includes a proposed reconstruction of the affidavit of probable cause, with some previously omitted information included. (*See* ECF No. 25-2 at 9-10.) While reconstructing an affidavit of probable cause word-by-word is a necessary inquiry to resolve a malicious prosecution claim at the summary judgment stage, *see, e.g.*, *Dempsey*, 834 F.3d at 468, 470-71, the Court concludes that for the purposes of adjudicating the Defendants' Motions to Dismiss, Morano has pleaded sufficient facts to nudge her claims "across the line from conceivable to plausible," *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 545).

is reliable enough." (quoting *Pinkney*, 95 F.4th at 749 (internal quotation marks omitted))).  In addition to the two omissions noted in her Complaint, Morano's Response to the Defendants' Motion to Dismiss points to other omissions from Sipple's Affidavit that are supported by the allegations in her Complaint and Exhibits and could be considered both recklessly omitted and material.  Specifically, Morano notes that the Affidavit did not mention that McCool broke the glass object during their argument, that McCool himself made the October report to ChildLine, or that McCool's October report was "closed immediately as duplicative" by CYF.  (*See* ECF No. 39 at 15-16.)  Sipple also did not include any information about the history of domestic disturbances and the ongoing custody dispute between McCool and Morano, or about his participation in enforcing Morano's custody order less than two weeks prior to the arrest.  (*See id.* at 5-6, 8-9.)

While Morano may overstate CYF's conclusion in asserting that it found the broken glass incident "unsubstantiated," that overstatement does not render implausible her claim that probable cause was lacking due to the omission in the affidavit of the conclusion drawn by CYF's investigations.  *See Andrews*, 853 F.3d at 698 ("Misleading assertions can relate to even 'minor details,' and do not need a separate determination of relevance.").  Sipple's report indicates only that Caseworker Selby told him "Morano admitted to 'putting [the child] down by the broken glass.'"  (ECF No. 2-1 at 87.)  Sipple argues that Morano's admission to Selby makes the addition of this information to the Affidavit "more inculpatory than exculpatory."  (ECF No. 25-2 at 10.)  However, Morano's admission as described in Sipple's contemporaneous report falls far short of corroborating the much more damning allegation in the resulting Criminal Complaint and Affidavit that it was Morano rather than McCool who initially "emptied the bag [of broken glass] on the floor" while stating that she then "placed a barefoot [child] in/on/around

25

the broken glass and told him to run." (ECF No. 2-2 at 31; *see also* ECF No. 2-1 at 60 (noting, in original May 2023 ChildLine report, that it was "unknown if the child was wearing shoes or clothing when placed in the glass and instructed to run across"); ECF No. 2-3 at 65, 68 (reproducing trial transcript of Selby's testimony as to her investigation of the broken glass incident).) Morano has pleaded a plausible claim that a reviewing magistrate would want to know more about Sipple's investigation and how the allegation in the initial report developed into the final allegation, and that the lack of such detail may support the conclusion that the cumulative effect of Sipple's omissions undermined "the reliability of the affiant or the affiant's witnesses," *Andrews*, 853 F.3d at 703 n.16, and therefore deprived the reviewing magistrate of the opportunity to make an independent assessment of probable cause, *see Dempsey*, 834 F.3d at 471 n.9 ("Even though the magistrate may agree with an officer that certain evidence is not material to probable cause, the officer must include that evidence if a reasonable person would know that it *could* affect the probable cause determination."); *see also Kendig*, 2026 WL 1145264, at *3. Accordingly, Sipple's Motion to Dismiss will be denied in this respect, and Morano's malicious prosecution claim against Sipple will proceed.[7]

---

[7] The first, second, and fifth elements of a malicious prosecution claim are clearly met here. *See Harvard*, 973 F.3d at 203. Sipple was responsible for issuing the warrant and took custody of Morano following her arrest, Morano was ultimately acquitted, and Morano was arrested and spent the night in jail as a result of the warrant. (*See* Compl. at 9, 11-12, 24.) As to the fourth element of malicious prosecution, the Court concludes that Morano's allegations are sufficient to support a plausible inference that Sipple acted for a purpose other than bringing her to justice for the offense charged. While, for the reasons discussed above, Morano's allegations are insufficient to support the conclusion that McCool and Marino were state actors through joint action or conspiracy, that does not preclude the Court from drawing an inference from Morano's allegations that Sipple's actions could have been motivated by a purpose other than prosecuting her for a crime. (*See, e.g.*, ECF No. 39 at 21-23.)

### 3.     First Amendment Retaliation

In Count XIII of her Complaint, Morano asserts a claim of retaliation under the First Amendment.  (*See* Compl. at 56-57.)  She alleges that the Defendants took adverse action against her in retaliation for: "making formal complaints to the police," seeking relief in custody and criminal court," and "challenging Defendants' conduct and asserting her parental and procedural rights."  (*Id.* at 56.)  As to Defendant Sipple, the Court understands Morano to assert a claim of retaliatory arrest.  Under the First Amendment, a government official is prohibited "from subjecting an individual to retaliatory action, including criminal prosecution, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  Morano must plead: "(1) that [s]he engaged in constitutionally[] protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." *George v. Rehiel*, 738 F.3d 562, 585 (3d Cir. 2013) (citation and quotation marks omitted).  A plaintiff alleging First Amendment retaliatory arrest must show the absence of probable cause. *See Nieves v. Bartlett*, 587 U.S. 391, 402 (2019).

The timing of the allegedly retaliatory behavior relative to the constitutionally protected conduct may provide a link between the two for purposes of pleading causation. *See Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016).  For example, allegations of (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link may be sufficient to allege a causal link. *See id.* at 424.  Moreover, causation, like any other fact, can be pled plausibly from the "record as a whole." *Id.*  "[W]here the temporal proximity is not so close as to be 'unduly suggestive,'" the appropriate test is "timing plus other evidence." *Id.*

27

Sipple argues that Morano's retaliatory arrest claim must fail because her complaints to police and legal actions over domestic disputes and custody matters do not involve matters of "public concern." (ECF No. 25-2 at 23-24 (citing, *inter alia*, *Alers v. City of Philadelphia*, 919 F. Supp. 2d 528, 554 (E.D. Pa. 2013) ("Anti-retaliation speech by a plaintiff claiming First Amendment violations is protected as a matter of public concern if it related to political, social, or community concerns, not where it is 'purely personal' as a private grievance.")).) Sipple's argument is inapposite, as the "public concern" doctrine is applicable only to situations "[w]here *a public employee* claims First Amendment retaliation by a government employer." *Alers*, 919 F. Supp. 2d at 553 (emphasis added). In the context of a private citizen claiming police retaliation based on her pursuit of her legal rights, filing a police report or lawsuit, or otherwise seeking to access the courts for legitimate means, even concerning private disputes, are unquestionably protected activities under the First Amendment. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) ("[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." (citation and quotation marks omitted)); *Price v. City of Philadelphia*, 239 F. Supp. 3d 876, 889 (E.D. Pa. 2017) ("[I]t is axiomatic that the filing of a lawsuit is protected conduct under the First Amendment." (citing *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997))); *Laws v. Borough of Lansdale*, No. 23-1339, 2024 WL 1078203, at *6 (E.D. Pa. Mar. 12, 2024) (stating that "making police reports, complaints, code violation reports, 911 calls, and correspondence with her local government" were "instances of protected activity," but concluding that plaintiff had failed to show the absence of probable cause for her arrest), *aff'd*, No. 24-1562, 2025 WL 1218186 (3d Cir. Apr. 28, 2025), *cert. denied*, 146 S. Ct. 198 (2025); *E.S. ex rel. Sanchez v. Elizabeth Bd. of Educ.*,

28

No. 20-1027, 2023 WL 398133, at *5 (D.N.J. Jan. 25, 2023) ("filing a police report is [a] First Amendment-protected activity" (citation omitted)).

Sipple also argues that Morano has not shown an unusually suggestive temporal proximity between her complaints of domestic violence in February 2022 and her arrest in 2024. (ECF No. 25-2 at 24.)  But that is not the extent of Morano's allegations.  As described above, Morano pleads that Sipple received authorization to file charges against her on November 1, 2023, when she and McCool were still cohabiting with the child, but that Sipple did not pursue those charges until after: Morano moved out, the custody dispute began, Morano filed her custody petition in Berks County, Morano enlisted Sipple's assistance in effecting a transfer of custody on December 21, 2023, and Sipple continued to be kept informed by McCool of the escalation in the custody dispute.  In addition, Morano has plausibly pleaded that Sipple lacked probable cause, for the reasons discussed above.  Thus, at this stage of proceedings, Morano has stated a plausible claim to relief for retaliatory arrest, and Sipple's Motion to Dismiss will be denied in this respect.

### 4.    Equal Protection

In Count V of her Complaint, Morano asserts a claim against Defendants Sipple and Hawley for a violation of her equal protection rights on a theory of gender-based policing. (Compl. at 46-47.)  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  Under the Equal Protection Clause, "law enforcement officers and prosecutors cannot exercise their considerable discretion in investigating or prosecuting criminal complaints

29

in a discriminatory manner." *Fullman v. City of Philadelphia*, No. 23-3073, 2024 WL 1637550, at *2 (3d Cir. Apr. 16, 2024) (citing *Burella v. City of Philadelphia*, 501 F.3d 134, 148-49 (3d Cir. 2007)); *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 197 n.3 (1989) ("The State may not . . . selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." (citation omitted)). "A plaintiff adequately pleads an equal protection claim by offering more than conclusory assertions and alleging that [s]he was treated differently from other similarly situated individuals." *Fullman*, 2024 WL 1637550, at *2 (citing *Children's Health Def., Inc. v. Rutgers, State Univ. of N.J.*, 93 F.4th 66, 84-85 (3d Cir. 2024)). "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (citation omitted). Morano asserts a claim for selective enforcement of laws, although it appears her claim might be better construed as a claim for selective prosecution. The United States Court of Appeals for the Third Circuit has held that selective prosecution and selective enforcement "are different Fourteenth Amendment claims." *Dique v. N.J. State Police*, 603 F.3d 181, 188 n.10 (3d Cir. 2010). Nevertheless, the standards "are virtually identical." *Davis v. Malitzki*, 451 F. App'x 228, 234 (3d Cir. 2011); *see also United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017) (explaining that "claims of selective prosecution and selective enforcement are generally evaluated under the same two-part test"). A plaintiff must plead "first, that persons similarly situated were not prosecuted; [and] second, that the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion or 'some other arbitrary factor.'" *Davis*, 451 F. App'x at 234 (citation omitted). A plaintiff must also plead that the alleged action was taken with "discriminatory purpose, not mere unequal treatment or adverse effect," and the state actor took "a particular course of action at least in part because of, not

merely in spite of, its adverse effects." *Suber v. Wright*, 574 F. App'x 207, 211 (3d Cir. 2014) (first quoting *Jewish Home of E. Pa. v. Ctrs. for Medicare & Medicaid Servs.,* 693 F.3d 359, 363 (3d Cir. 2012); then quoting *Wayte v. United States,* 470 U.S. 598, 610 (1985)).

Morano alleges that Defendants Sipple and Hawley "treated her less favorably than similarly situated male complainants based on her gender and perceived parental role." (*Id.* at 46.) She identifies McCool as the lone "similarly situated male complainant" and asserts that the Defendants "selectively enforced legal process in McCool's favor." (*Id.*) Morano alleges that "Corporal Sipple and Chief Hawley repeatedly dismissed [her] reports of domestic abuse and portrayed her as unstable and manipulative without evidentiary support, while crediting and assisting Defendant McCool's claims." (*Id.*)

The Court understands Morano's claim to be that the differential treatment occurred when she was charged with endangering the welfare of a child based on allegations made by McCool related to the March 2023 broken glass incident, but McCool was not charged with domestic violence based on her allegations he pushed her on her surgical scar in February 2022.[8] The Court is unable to draw the inference that these two situations render Morano and McCool similarly situated for the purposes of an equal protection claim because they are not alike in all relevant aspects, *Startzell*, 533 F.3d at 203, specifically, in the type of conduct they reported.

---

[8] Morano's pleading is not entirely clear on whether or how she sought to press charges related to the February 2022 incident. She asserts that she emailed the PFA to Sipple after it was issued and he served it on McCool; she was accidentally copied on an email from Hawley expressing his belief that there was not probable cause to charge McCool; and she was told directly by Sipple that there would not be any charges and later by Hawley that she should stop contacting STPD about the incident. (*See* Compl. at 14-15.) Morano also includes the records of the PFA proceedings and states that she allowed the PFA to be dismissed in the interests of preserving the family structure. (*Id.* at 9.) But Morano does not expressly plead that she sought to press charges against McCool for domestic violence and Sipple and Hawley refused to file those charges.

The heart of Morano's claim is a comparison of two distinct situations that coincidentally involved the same actors: she asserts that Sipple and Hawley "refused to investigate" her allegations of domestic violence against McCool, but they credited McCool's later account of child endangerment and prosecuted her for it.  (Compl. at 32.)  In essence, she is asserting that she was entitled to have the police investigate McCool in February 2022, because McCool's allegations generated a police investigation of her for child endangerment in October 2023. These two situations do not render them similarly situated because they concern different allegations of criminal behavior carrying different law enforcement priorities since only the one involved child endangerment allegations.  *See, e.g.*, *United States v. McIver*, 809 F. Supp. 3d 221, 245-46 (D.N.J. 2025) (noting in the context of an equal protection claim that "the Government retains broad discretion as to whom to prosecute," and that "[t]o determine whether individuals are similarly situated, courts assess a variety of factors, including the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan" (internal quotation marks omitted) (quoting *Wayte*, 470 U.S. at 607)), *appeal filed*, No. 25-3573 (3d Cir. Dec. 30, 2025). In the absence of allegations that render Morano and McCool similarly situated for the purposes of a selective enforcement or selective prosecution claim, Morano fails to state a claim to relief because, generally, "[t]here is no constitutional right to a police investigation." *Thomas v. City of Philadelphia*, 290 F. Supp. 3d 371, 386 (E.D. Pa. 2018) (internal quotation marks and citation omitted); *see also Ford v. Kenney*, No. 22-5059, 2023 WL 349180, at *7 (E.D. Pa. Jan. 19, 2023)

32

(noting that "there is no constitutional right to have crimes investigated by the police"). In sum, Morano fails to state a plausible equal protection claim.[9]

### 5. Due Process Claims

In Count XII of her Complaint, Morano asserts claims for violations of her Fourteenth Amendment right to due process. (*See* Compl. at 54-56.) The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To state a claim under § 1983 for a violation of her procedural due process rights, "a plaintiff must allege that (1) [s]he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to [her] did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

Morano's assertions under the heading of due process largely repeat the allegations supporting her malicious prosecution claim, (*see* Compl. at 54-55; *see also* ECF No. 25-2 at 22-23), and to that extent she fails to state a due process claim under the "more-specific-provision" rule, s*ee generally Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive

---

[9] To the extent that Morano intended to assert a due process claim based on STPD's non-prosecution of McCool, she fails to state a claim, because an individual citizen "generally has no due process right to police protection or enforcement of state laws," *Fullman*, 2024 WL 1637550, at *2 (citing, *inter alia*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005); *Burella v. City of Philadelphia*, 501 F.3d 134, 146 (3d Cir. 2007)), and does not have a "judicially cognizable interest in the prosecution or nonprosecution of another," *id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

due process, must be the guide for analyzing these claims." (internal quotations omitted)); *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (discussing the "more-specific-provision rule" pursuant to which claims should be analyzed under the standards relevant to the more specific provision of the Constitution under which that claim falls, rather than under the Due Process Clause as a catch all)); *see, e.g., Flynn v. Lawless*, No. 24-2706, 2025 WL 2404389, at *4 (E.D. Pa. Aug. 19, 2025) (analyzing unlawful arrest claims under the Fourth Amendment rather than the Fourteenth Amendment (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989))).

To the extent that Morano alleges interference with her parental rights separately from her malicious prosecution claim, she still fails to state a due process claim. "[P]arents have a constitutionally cognizable liberty interest in the care, custody, and management of their children." *Dennis v. DeJong*, 867 F. Supp. 2d 588, 623 (E.D. Pa. 2011). But while "parents have a fundamental liberty interest in the custody of their children they do not always have a right to prior process when the state removes their children from their custody . . . [and,] in emergency circumstances which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or a court order." *Patterson v. Armstrong Cnty. Child. & Youth Servs.*, 141 F. Supp. 2d 512, 530-31 (W.D. Pa. 2001) (citations and quotation marks omitted); *see also Lowe v. Lancaster Cnty. Child. and Youth Soc. Servs.*, No. 20-1413, 2020 WL 7223416, at *7 (E.D. Pa. Dec. 8, 2020) (holding that even if father did not receive notice of an emergency custody hearing, "the court held a prompt second hearing . . . about which [he] was notified. Accordingly, had there been a due process violation, this hearing would have cured any violation."). Even assuming that Morano's due process claim based on purported interference with her parental rights could be considered to arise separately from her malicious prosecution claim, she pleads facts and attaches exhibits demonstrating her

34

many opportunities to participate in hearings concerning custody of the child and her bail conditions, so she fails to state either a procedural or substantive due process claim.

### 6.      *Brady* **Claims**

In Count XI of her Complaint, Morano alleges that Defendants Sipple and Hawley "violated [her] due process rights by deliberately withholding and suppressing exculpatory evidence in violation of *Brady v. Maryland*[, 373 U.S. 83 (1963)]." (Compl. at 52-53.) The defendants argue that because Morano was acquitted at her criminal trial, her claim necessarily fails. (*See* ECF No. 25-2 at 21-22 (citing, *inter alia*, *Wilson v. City of Philadelphia*, 177 F. Supp. 3d 885, 913 (E.D. Pa. 2016) ("A *Brady* violation occurs if the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produce a different verdict.")).) The Court agrees.

"A plaintiff asserting a violation of *Brady* must plausibly allege: (1) the evidence at issue is favorable to the accused, because it is either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was material." *Wagner v. City of Philadelphia*, No. 25-1450, 2026 WL 789450, at *11 (E.D. Pa. Mar. 20, 2026) (cleaned up) (first quoting *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011); then citing, *inter alia*, *Carson v. City of Philadelphia*, No. 23-2661, 2024 WL 3792223, at *5 (E.D. Pa. Aug. 13, 2024) (applying these elements to a § 1983 due process claim for withholding *Brady* evidence)). In the *Brady* context, evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Smith v. Holtz*, 210 F.3d 186, 197 (3d Cir. 2000) (citation omitted). Prejudice "is the *sine qua non*" of a *Brady* claim, no matter how "reprehensible and unethical [the] conduct of some of those involved in [the] prosecution." *Id.* Morano was acquitted. She cannot show that the

disclosure of any of the information she alleges to have been suppressed would have produced a different, more favorable result to her criminal proceedings, so she fails to state a due process claim based on the Defendants' purported *Brady* violations.

### 7.      Official Capacity, Supervisory Liability, and *Monell*

Morano brings all her claims against Sipple and Hawley in both individual and official capacities.  (*See* Compl. at 6.)  "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978)).  In other words, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity" that employs the individual.  *Id.*  Accordingly, the Court construes any official capacity claims against Sipple and Hawley together with her claims for supervisory and municipal liability.

The bulk of Morano's claims against Hawley are based on a theory of supervisory liability elaborated in Count VII of the Complaint.[10]  (*See* Compl. at 32-33, 50-51.)  "A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Iqbal*, 556 U.S. at 676 (explaining that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) ("Each Government official, his or her title notwithstanding, is only liable for his or her *own* misconduct.") (quoting *Iqbal*, 556 U.S. at 677) (emphasis in original); *Dooley v.*

---

[10]  Morano's claims against Hawley in his individual capacity relate to her equal protection, due process, and *Brady* claims, (*see* Compl. at 32-33, 46-47, 52-55), which the Court will dismiss for the reasons discussed above.

*Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)). "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Baker v. Monroe Township*, 50 F.3d 1186, 1194 (3d Cir. 1995); *Rode*, 845 F.2d at 1201 n.6).

Generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation. *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)). Also, liability under § 1983 cannot be predicated on a *respondeat superior* basis. *Chavarriaga*, 806 F.3d at 227; *Robinson v. Delbalso*, No. 22-2378, 2022 WL 17248100, at *2 (3d. Cir. Nov. 28, 2022) (*per curiam*).

Rather, "[s]uits against high-level government officials must satisfy the general requirements for supervisory liability." *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017). There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.*

37

(quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)).  "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct."  *Chavarriaga*, 806 F.3d at 227.

The first type of liability includes a failure to supervise, however, a plaintiff asserting such a claim must "identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure."  *Barkes*, 766 F.3d at 317; *see also Chavarriaga*, 806 F.3d at 227.  A supervisory claim requires "a showing that there was an actual constitutional violation at the hands of subordinates" before finding liability on the part of the supervisory official.  *Allen v. Eckard*, 804 F. App'x 123, 127 (3d Cir. 2020) (*per curiam*) (concluding that failure to train and supervise claims asserted against supervisor defendants were meritless where the plaintiff failed to make a plausible showing of an underlying constitutional violation).

To set forth a claim for supervisory liability under the policy-and-practice strand of supervisory liability, a plaintiff must:

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

38

*Chavarriaga*, 806 F.3d at 227 (quoting *Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir. 2001)).  "Put another way, the [plaintiff] must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the . . . risk of injury and must establish a link between the supervisor, the act, and the injury."  *Id.*

Morano fails to state a claim for supervisory liability against Chief Hawley related to her malicious prosecution and retaliation claims.  She alleges Hawley's personal involvement in determining that there was not probable cause to charge McCool with any crime related to the February 2022 incident and makes allegations against Hawley concerning use and dissemination of bodycams and footage and role in the STPD bodycam policies. (*See* Compl. at 8, 14-15, 26, 32-33).  But the Court has determined that she fails to state any plausible claim to relief as to her equal protection, due process, and *Brady* claims and there can thus be no derivative supervisory claim based on those allegations.  *Allen*, 804 F. App'x at 127.  As to her malicious prosecution and retaliation claims, she makes nothing more than conclusory allegations that Hawley "ratified" Sipple's conduct or granted approval to other actions, (*see id.* at 32-33, 41), so she has failed to plead any specific factual details to link Hawley to the alleged acts of others or her injuries.

In Count III of her Complaint, Morano asserts a claim for municipal liability against STPD.  (*See* Compl. at 49-50.)  Following the decision in *Monell*, courts concluded that a police department is a sub-unit of the local government and, as such, is merely a vehicle through which the municipality fulfills its policing functions.  *See e.g. Johnson v. City of Erie*, 834 F. Supp. 873, 878-79 (W.D. Pa. 1993).  Thus, while a municipality may be liable under § 1983, a police department, as a mere sub-unit of the municipality, may not.  *Id.*; *see also Martin v. Red Lion Police Dept.*, 146 F. App'x. 558, 562 n.3 (3d Cir. 2005) (*per curiam*) (stating that police

39

department is not a proper defendant in an action pursuant to 42 U.S.C. § 1983 because it is a sub-division of its municipality); *Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 (3d Cir. 1997) ("As in past cases, we treat the municipality and its police department as a single entity for purposes of section 1983 liability" citing *Colburn v. Upper Darby Township*, 838 F.2d 663, 671 n.7 (3d Cir.1988)); *Hadesty v. Rush Twp. Police Dep't*, No. 14-2319, 2016 WL 1039063, at \*9 n.4 (M.D. Pa. Mar. 15, 2016).  Therefore, STPD is not a proper defendant in this case under Section 1983 and is dismissed.

Morano asserts that this defect in her pleading may be cured by substituting Sadsbury Township in place of STPD as the relevant municipal defendant.  (*See* ECF No. 39 at 14.) Morano fails to state a claim for *Monell* liability, regardless of the named Defendant.  Pursuant to § 1983, a plaintiff may state a claim for municipal liability by alleging that the municipality's policies or customs caused a violation of the plaintiff's federal constitutional rights.  *See Monell*, 436 U.S. at 694; *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003). "A plaintiff must also allege that the policy or custom was the 'proximate cause' of [her] injuries," which can be done "by demonstrating an 'affirmative link' between the policy or custom and the particular constitutional violation" alleged.  *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).  "It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim."  *See Mulholland v. Gov't Cnty. of Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013).

Here, any derivative municipal claim must relate to Morano's allegations of malicious prosecution or retaliatory arrest, given that she has failed to state a claim for any other underlying constitutional violations.  However, as discussed above, the policies and customs she alleges all relate to her equal protection and *Brady* claims, and she fails to plead any connection

40

between her surviving federal claims and any municipal policy or custom.  Thus, even if she were to substitute the proper defendant, she still has not pleaded a claim from municipal liability.[11]

### B.      Claims under State Law

Morano asserts claims under state tort law for abuse of process and intentional infliction of emotional distress.  (Compl. at 44-46, 47-48.)  Because the Court has original jurisdiction over Morano's federal claims under 28 U.S.C. § 1331, the exercise of supplemental jurisdiction over any state law claim is proper where it is "so related" to the federal claims "that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  The Court concludes that Morano's state law claims are sufficiently related to her remaining federal claims to warrant the exercise of supplemental jurisdiction.

---

[11]  Hawley correctly notes that, as a matter of law, he is not a final policymaker for the purposes of a *Monell* claim.  (*See* ECF No. 25-2 at 18 (citing *Santiago v. Warminster Township*, 629 F.3d 121, 135 n.11 (3d Cir. 2010) ("[A]s a matter of Pennsylvania state law, a township Police Chief is not a final policymaker." (citations omitted))).)  It is not clear that Morano is required to identify the relevant policymaker at this stage.  *See, e.g.*, *Harbaugh v. Bucks County*, No. 20-1685, 2022 WL 16722333, at *4 (E.D. Pa. Nov. 4, 2022) ("Even if, for sake of argument, Plaintiff were required to identify a specific policymaker to establish an affirmative policy, this would not preclude Plaintiff from proceeding on failure to train and failure to supervise theories. All in all, a jury is permitted to find *Monell* liability if [the relevant entity] 'turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights' such that '[unnamed] policymaker[s,] can reasonably be said to have been deliberately indifferent to the need.'  Plaintiff need not identify the specific municipal policymaker to prove it." (first citing *Forrest v. Parry*, 930 F.3d 93, 106-06 (3d Cir. 2019); then quoting *Parkell v. Danberg*, 833 F.3d 313, 338 (3d Cir. 2016))).  However, because Morano has not demonstrated an affirmative link between the municipal policies or customs she alleges and her remaining claims, the Court need not decide whether pleading the relevant policymaker is essential to state a claim for relief.  *See Santiago*, 629 F.3d at 135 ("[E]ven if Chief Murphy were a final policy maker and his plan were deemed to be official Warminster policy, Santiago has failed to properly plead that the plan was the source of her injury.").

41

### 1.    Abuse of Process

In Count IV, Morano asserts a claim for abuse of process against Sipple, McCool, and

Marino.  (*See* Compl. at 44-46 (citing, *inter alia*, *Lerner v. Lerner*, 954 A.2d 1229 (Pa. Super. Ct.

2008).)  Under Pennsylvania common law:

> The tort of "abuse of process" is defined as the use of legal process against another
> primarily to accomplish a purpose for which it is not designed.  To establish a claim for
> abuse of process it must be shown that the defendant (1) used a legal process against the
> plaintiff, (2) primarily to accomplish a purpose for which the process was not designed;
> and (3) harm has been caused to the plaintiff.  This tort differs from that of wrongful use
> of civil proceedings in that, in the former, the existence of probable cause to employ the
> particular process for its intended use is immaterial.  The gravamen of abuse of process is
> the perversion of the particular legal process for a purpose of benefit to the defendant,
> which is not an authorized goal of the procedure.  In support of this claim, the [plaintiff]
> must show some definite act or threat not authorized by the process, or aimed at an
> objective not legitimate in the use of the process . . . ; and there is no liability where the
> defendant has done nothing more than carry out the process to its authorized conclusion,
> even though with bad intentions.

*Lerner*, 954 A.2d at 1238 (alterations in original) (citation omitted); *see also General*

*Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 304-05 (3d Cir. 2003)).  "Illegitimate

purposes include, for example, extortion, forcing a defendant to surrender a legal right, or

blackmail." *Price v. City of Philadelphia*, 239 F. Supp. 3d 876, 904 (E.D. Pa. 2017) (cleaned

up).

Sipple argues merely that Morano's abuse of process claim fails because she "failed to

sufficiently state any Fourth Amendment claims."  (ECF No. 25-2 at 14.)  McCool argues that,

"[e]ven if Plaintiff's unfounded allegations that Defendant McCool reported her conduct to the

police in order to benefit from her arrest in the civil custody proceedings are true, [he] still

cannot be held liable for abuse of process[, because Morano] simply pleaded no facts in the

Complaint to suggest that Defendant McCool's *primary purpose* was to pervert the legal system.

(ECF No. 34 at 19 (citing, *inter alia*, *General Refractories*, 337 F.3d at 304-08).)  Marino argues

that Morano has failed to plead that Marino acted with an improper purpose.  (ECF No. 43 at 15-

42

16.)

The gravamen of Morano's claim is that the Defendants used both the arrest warrant and the PFA on January 5 primarily for the purpose of influencing the custody proceedings, rather than for the purposes that they were designed.  As described at length above, Morano plausibly pleads a lack of probable cause supporting the arrest warrant.  As to the PFA, Morano plausibly alleges throughout her Complaint that McCool and Marino did not have a true fear for the welfare of the child and did not believe that Morano posed an immediate danger to the welfare of McCool or the child, and thus that their use of the PFA, with Sipple's assistance, after it was issued were not primarily for the stated purposes of the PFA but rather to achieve goals in the custody dispute.  (*See* Compl. at 30, 34-36, 38-39, 44-45.)  Morano has therefore stated a plausible claim for abuse of process, and the Motions to Dismiss will be denied in this respect.[12]

### 2.    Intentional Infliction of Emotional Distress

In Count VI, Morano asserts a claim for intentional infliction of emotional distress ("IIED") under Pennsylvania law.  (*See* Compl. at 47-48.)  "To state a claim for IIED under Pennsylvania law, the plaintiff must allege intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff *and some type of resulting physical harm* due to the defendant's conduct."  *Davis v. Wigen*, 82 F.4th 204, 216 (3d Cir. 2023) (emphasis added) (internal quotation marks omitted) (quoting *Swisher v. Pitz*, 868 A.2d

---

[12]  Morano also asserts that her abuse of process claim may be grounded in § 1983.  (*See* Compl. at 46-47 (citing, *inter alia*, *Rose v. Bartle*, 871 F.2d 331 (3d Cir. 1989)).)  McCool and Morano are not state actors, as discussed above.  To the extent that Morano asserts her abuse of process claim against Sipple pursuant to § 1983, the court concludes that the elements of such a claim are not materially distinguishable for present purposes, and therefore she has stated a claim to relief, regardless of the source of law.  *See Rose*, 871 F.2d at 350 n.17 ("In contrast to a section 1983 claim for malicious prosecution, a section 1983 claim for malicious abuse of process lies where prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by the law." (internal quotation marks and citation omitted)).

1228, 1230 (Pa. Super. Ct. 2005); *see also Oldham v. Pa. State. Univ.*, 138 F.4th 731, 758-59 (3d Cir. 2025) (comparing Pennsylvania and North Carolina law on IIED). "Liability attaches 'for only the most clearly desperate and ultra extreme conduct.'" *Davis*, 82 F.4th at 216 (quoting *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998)).

Defendants argue that Morano does not state an IIED claim because, among other reasons, she does not plead that she suffered a physical injury as a result of the alleged harm. (*See* ECF No. 34 at 20-21; No. 43 at 17.) Indeed, Morano pleads emotional, reputational, and psychological harms, but does not state that she suffered any physical harm. (*See* Compl. at 48, 57.) Accordingly, her IIED claim will be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss will be denied as to Morano's claims against Corporal Sipple in his individual capacity for malicious prosecution and First Amendment retaliation, and her claims against Sipple, McCool, and Marino for abuse of process.[13] In all other respects, the Motions will be granted. Defendants Sipple, McCool, and Marino shall file appropriate responsive pleadings as to the remaining claims in accordance with Federal Rule of Civil Procedure 12(a)(4).

---

[13] The Court expresses no opinion at this time as to whether principles of preclusion or abstention might foreclose any of Morano's requested relief, because the Complaint, its Exhibits, and public records do not indicate the precise outcome of the custody proceedings between McCool and Morano or whether those proceedings are ongoing in any respect, and the parties have not argued or briefed any such issues.